UNITED STATES DISTRICT COURT          FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

GAIL KITT,

                              Plaintiff,          MEMORANDUM
                                                  AND ORDER

          - versus -

COMMISSIONER OF SOCIAL SECURITY,                  14-CV-5632 (JG)

                              Defendant.

A P P E A R A N C E S:

          GAIL KITT
                    Broadway House Women's Shelter
                    1245 Broadway, #18
                    Brooklyn, New York 11221
          By:       *Pro Se Plaintiff*

          KELLY T. CURRIE
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
          By:       Candace Scott Appleton
                    *Attorney for the Defendant*

JOHN GLEESON, United States District Judge:

          On August 5, 2014 Gail Kitt brought this action against the Commissioner of

Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g).  Kitt seeks review of the

Commissioner's final decision dated December 3, 2013, which found that she was not disabled

and therefore not entitled to disability insurance benefits or Supplemental Security Income

("SSI") as provided for in Titles II and XVI of the Social Security Act ("the Act").  The parties

cross-move for judgment on the pleadings, with the Commissioner seeking an affirmation and

dismissal, and Kitt seeking a grant of benefits or a remand for a new hearing and consideration of

newly submitted evidence.   For the reasons that follow, the Commissioner's motion is denied

and Kitt's motion to remand for further proceedings consistent with this opinion is granted.

PRELIMINARY STATEMENT

Born on October 20, 1953, Kitt is 61 years old.  She raised six children in New

York City as a single mother.  Her record details a work history that spans more than three

decades.  For 25 years, she served as an administrative assistant in the Manhattan District

Attorney's Office.  She then worked in a similar capacity for two years at a law firm.[1]  In an

effort to continue developing her professional skills, she attended a trade school for medical

billing and coding between 2008 and 2010, and she received a certificate.  That didn't prove

fruitful, however, and in 2011 she worked as a housekeeper to make ends meet.  Her last job as a

factory worker only lasted two days because her physical condition caused her to sit down too

often.

One month shy of her 58th birthday, Kitt came to terms with the fact that she

could no longer work due to the pain and other complications arising from her diabetes mellitus

and degenerative disk disease.  As she put it, after getting fired from her factory job:

> I came to the realization I can't do this.  . . . I have to realize what
> my limitations are . . . I've always been a person that went out
> there and I worked and I worked hard.  I was in the DA's office all
> those years . . . I had two sons that were killed during that time.  I
> went back to work maybe a week after losing a son.  I didn't stay
> out of work because I was always a hard working person.  And I'm
> devastated by my condition as well because I'm not used to having
> to depend on other people. . . . I raised six kids and I've never had
> to depend on anybody.  . . . I worked because that's the way I was
> raised, to take care of yourself.  And it's devastating to me not to
> be able to do what I used to do . . . I used to walk, I used to
> exercise, I used to do all those things.  I can't do it now.  And it

---

[1]     As an administrative assistant, Kitt walked or stood for 1 to 4 hours a day, sat for 6 to 7
hours a day, frequently lifted 10 pounds, and sometimes lifted up to 40 pounds.

was very difficult for me to accept that. Even though I was feeling sick and everything in the beginning I didn't tell my kids because I didn't want them worrying about me. But they could see it because all the weight and stuff that I was losing. And that was the reason why my daughter, she paid for me to go, she said mom, you've got to go to the doctor. I was scared too because I didn't know what was going on.

R. at 60-61.[2]

Social security benefits are a safety net (though a lifeline might be a better analogy) for people like Kitt. "Congress intended the Social Security Act as a broad program of social insurance, on which working people could rely to provide for themselves and their dependents in old age and when disabled[.]" *Rosenberg v. Richardson*, 538 F.2d 487, 490 (2d Cir. 1976) (internal citations omitted); *see also Stewart v. Cohen*, 309 F. Supp. 949, 954 (E.D.N.Y. 1970) ("[T]he basic purpose of the Social Security Act . . . [is] the protection of our people from economic destitution and resort to charity as a result of a disabling accident or illness."). Congress also intended for the social insurance program to operate as an earned benefit, not welfare. *See* William G. Dauster, *Protecting Social Security and Medicare*, 33 Harv. J. on Legis. 461, 463 (1996). And it operates that way – all workers pay part of their wages into the system in return for protection against the "risks of loss of earnings due to retirement, death, or disability." *See id.* at 463-64. "When the risks become realities, the system pays participants benefits that they have earned by paying the premiums." *Id.* at 464. As such, Kitt is exactly the type of person the system is intended to protect: people who work hard, pay into the system, and need the lifeline because the risk of disability has become a reality. It is intended to help keep people from situations like the one she endured: living for nine months without water or

---

[2] Citations in the form "R._" refer to pages of the administrative record. ECF No. 16.

electricity because she couldn't afford to pay her bills. *See* R. at 59 ("I lived there for about nine months without any water because I didn't have money to pay for anything. I was living in the dark . . . [a]nd I didn't really want to be a burden on my children[.]").

For this reason, the spirit of the administrative review process is beneficent, not adversarial. *See* 20 C.F.R. § 405.1(c)(1) ("In making a determination or decision on your claim, we conduct the administrative review process in a non-adversarial manner."); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("The model is investigatory, or inquisitorial, rather than adversarial"); *Seavey v. Barnhart*, 276 F.3d 1, 4 (1st Cir. 2001) (because a hearing for disability benefits is a non-adversarial process, "the Commissioner is not a litigant [in the matter] and has no representative at the agency level" ). In keeping with this spirit, an "ALJ's role . . . is analogous to that of a trial judge, for whom it is clearly improper to interfere with the questioning of a witness, particularly when it is done in a partisan manner." *Fulwood v. Heckler*, 594 F. Supp. 540, 547 (D.C. Cir. 1984) (citing cases). Indeed, an ALJ has no interest in denying benefits and is to serve as a neutral fact-finder, not an "advocate with a predetermined mind destined to reach a predetermined result." *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 410 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."). Thus, the ALJ has a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts*, 94 F.3d at 37 (internal quotation marks omitted). From the duty to develop the record follow the duty to listen to subjective complaints of disabling pain and, above all, the duty to be fair. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("The ALJ should not be biased or predisposed to granting or denying benefits, nor should the ALJ develop the record in a manner that favors one side and disfavors the other.").

The proceedings in this case failed to live up to these principles. One need only read through the hearing transcript to understand how far astray the ALJ ventured from them. Rather than conduct a fact-finding exploration, the ALJ confronted Kitt with "gotcha" type questions that reeked of skepticism throughout the hearing.[3] An underlying tone of hostility and doubt replaced that of a neutral fact-finder charged with investigating all aspects of a claimant's situation.

In sum, the ALJ's hostility toward Kitt impaired his ability to properly develop the record, and, consequently, to properly evaluate Kitt's credibility. Most importantly, it stripped the proceedings of fairness. Accordingly, I am remanding the case for further proceedings before a different ALJ.

BACKGROUND

A.    *The Medical Evidence*

Kitt's treatment for the relevant period began in August 2011, when she sought treatment at Mountain Healthcare in Tobyhanna, Pennsylvania, though the record does not state who treated her. R. at 190. The next month, Dr. Marc Keuler, an internist at PMC Physician Associates in Tobyhanna examined Kitt. *Id.* at 232-33. Kitt reported a history of gestational diabetes and said she had experienced weight loss, tingling in her hands and feet, and frequent urination. *Id.* at 232. She weighed 135 pounds. *Id.* Keuler diagnosed diabetes mellitus type II and abnormal weight loss and ordered a full blood and urine work up. *Id.* at 232, 234-36. Kitt

---

[3]    For example, consider the following exchange, during which the ALJ doesn't allow Kitt to finish her answer:

| ALJ: | He didn't tell you that? |
| Kitt: | He wrote – |
| ALJ: | That's what he said, he explained it to you. |

R. at 39. At another point, Kitt testified that she had indeed experienced dizziness although she had denied having "syncope" in a medical evaluation in the record, and rather than determine whether she understood what "syncope" meant, the ALJ challenged her claim by asking, "Well how come they say you didn't?" R. at 41.

visited Keuler the following month, and he again confirmed diabetes mellitus type II and abnormal weight loss, and prescribed Metformin. *Id.* at 230.

Seven months later, on May 15, 2012, Kitt visited Dr. Cary A. Davidson at the Geisinger Clinic in Pennsylvania. *Id.* at 249. Kitt had run out of Metformin and wanted to apply for Medicaid. *Id.* She complained of headaches, frequent urination, shortness of breath, weight loss, back pain that radiated through her legs, and numbness in her feet. *Id.* She weighed 133 pounds. *Id.* at 250. Davidson noted that Kitt's diabetes was "not controlled at all." *Id.* at 265. He also noted Kitt had some limitation of flexion in her back. He diagnosed sciatica and prescribed Glyburide for the diabetes and Gabapentin for the sciatica. *Id.* at 251, 255. Kitt had no new or unusual musculoskeletal symptoms. *Id.* at 249. Davidson stated that she was "disabled for four months." *Id.* at 251.

Kitt began seeing Dr. Mohammed S. Hossain for her back pain and diabetes in May 2012. Hossain prescribed Hydroxyzine and Triamcinolone for Kitt's eczema, and Lantus and Metformin for her diabetes. *Id.* at 209. On June 7, 2012, Kitt visited Hossain again. *Id.* at 266-87. Her muscle strength was diminished in both legs due to back pain and she had paralumbar tenderness. *Id.* at 267. Hossain recommended that Kitt take insulin for her diabetes. *Id.* at 37, 266. Hossain opined that Kitt did not meet the criteria for permanent disability based on her sciatica, but said she was disabled for three months. *Id.* at 267.

On June 14, 2012, Kitt returned to Dr. Hossain, who noted that Kitt's weight had dropped to 129 pounds and that she had high blood glucose. *Id.* at 274. Hossain diagnosed diabetes, sciatica, and dyslipidemia (an abnormal amount of cholesterol or fat in the blood), and prescribed Metformin, Glyburide, Gabapentin, Aspirin, and Pravachol. *Id.* at 274-75. He also told her to resume taking Lisinopril, which she had stopped taking, and ordered diabetic eye and

foot exams, a mammogram, a gynecological exam, and a colonoscopy. *Id.* at 275-76. Kitt reported that the Metformin caused dizziness, rash outbreaks, irregular heartbeats, difficulty breathing, swelling of the face, drowsiness, back pain, and frequent urination. Pravastatin, which she took for high cholesterol, caused her headaches, nausea, and tiredness. *Id.* at 201-04.

In September 2012, Kitt reported that she had started taking insulin once a day in addition to Metformin, which she was still taking twice a day. *Id.* at 207. Her blood sugar levels were not controlled and she could not stand or sit for long periods of time. *Id.* She reported difficulty sleeping, shortness of breath, pain in her stomach, dizziness, stress, and lower back and leg pain, and had developed eczema on her back. *Id.* at 207, 210. At this time, Kitt's pain was severe enough to keep her in bed some days. *Id.* at 210.

Ten months later, in April of 2013, Kitt began treatment with Nurse Practitioner Francisco Diaz at New York University's College of Nursing. *See id.* at 297-98, 302, 304, 307-11. Diaz ordered x-rays of Kitt's hips in May 2013, which revealed degenerative changes as evidenced by moderate productive changes along the superolateral joint margins. *Id.* at 299. There were also degenerative changes of the lower lumbosacral spine that were incompletely evaluated and notes of an old unfused fracture of the left greater trochanter. *Id.*

Diaz completed a disability assessment on June 18, 2013. *Id.* at 290-96. He had treated Kitt every three weeks from April 12 to June 18, 2013. *Id.* at 290. Kitt had been taking her medication and attending physical therapy, and her diabetes remained uncontrolled despite taking insulin. *Id.* at 290, 292, 300, 301. Diaz noted that insulin can cause dizziness, fatigue, and cloudy vision. *Id.* at 292. He also noted that Kitt has degenerative joint disease of the spine and hips with consequent morning stiffness, walking disturbance, and pain in her back and hip that worsens with prolonged rest or weight pressure. *Id.* at 291. Diaz explained that Kitt needed

to lie down during the day, and that it would require three hours of lying down to relieve her pain. *Id.* at 292. Diaz opined that Kitt could sit continuously for one hour at a time and for a total of five hours in a day, stand continuously for one hour and for a total of two hours in a day, and walk continuously for ten minutes at a time and a total of five hours in a day. *Id.* at 293. Diaz noted that Kitt could not lift more than five pounds, and could only lift one to five pounds occasionally. *Id.* at 293. Kitt could never squat, crawl, climb, or reach, and she could only occasionally bend. *Id.* at 294. She should avoid driving a car. *Id.* at 295. She could only handle (cross-manipulation) and finger (fine-manipulation) frequently with her left hand, which reflects the physical requirements of 34 to 66 percent of an eight-hour work day. *Id.* at 293-94. Diaz based these restrictions on Kitt's diabetes and its treatment, which could affect her functioning. Specifically, Kitt would have difficulty commuting by bus or subway because of the pain and dizziness caused by walking, and the need to rest to relieve the pain. *Id.* at 294-95.

In her application for benefits, Kitt reported that in May 2013 she was being treated by a Dr. Haden and Scott Salvato, a Physician's Assistant at the Urban Health Plan in the Bronx. *Id.* at 213. She also stated that Haden had referred her to a bone specialist and for physical therapy. *Id.* at 214. Salvato had ordered blood and urine tests to follow up on her diabetes, though the results are missing from the administrative record. *Id.* at 288.

B.    *The Consultative Exam*

The ALJ scheduled an appointment for Kitt with Dr. Dipti Joshi on September 23, 2013. *Id.* at 315. Joshi diagnosed lower back pain with radiculopathy, diabetes with neuropathy, pain in wrists and fingers, hypercholesterolemia, history of eczema, and neuropathy. *Id.* at 315-16. He commented that Kitt had limitations with bending, squatting, and reaching with her shoulders, and that she should avoid any heavy lifting, carrying, pushing, or pulling. *Id.* at 316. He then assessed that Kitt could occasionally (very little to one-third of the time) lift up

to ten pounds and could never lift or carry more than that. *Id.* Joshi opined that Kitt could sit for five hours, stand for two hours, and walk for two hours at one time, but also that she could sit for six hours, stand for one hour, and walk for one hour total in an eight-hour work day. *Id.* at 319. Joshi confirmed that it was medically necessary that Kitt use a cane to walk. *Id.* He opined that Kitt could only occasionally reach, handle, push, pull, finger, or feel with her hands. *Id.* at 320. Joshi noted that Kitt had a limited range of motion and could only occasionally climb stairs, ramps, ladders and scaffolds, and that she could only occasionally balance, stoop, kneel, crouch, or crawl. *Id.* at 321.

C.    *The Commissioner's Decision*

       The ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v) for determining whether an applicant is disabled within the meaning of the Act. At the first step of the sequential analysis, the ALJ found that Kitt had not engaged in substantial gainful activity since her alleged onset date of September 3, 2011. R. at 24. At step two, the ALJ found that Kitt's diabetes mellitus with lower extremity neuropathy and degenerative disc disease constituted a "severe" impairment, which "imposes more than minimal limitations upon [Kitt's] ability to work." *Id.* At step three, the ALJ found that these impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404 Subpart P, Appendix 1 because her "severe impairment does not meet . . . the criteria of a listed impairment" and the "medical evidence does not indicate the existence of diabetic ketoacidosis or chronic hyperglycemia . . . [and] there is no indication that [Kitt] is unable to ambulate effectively." R. at 25. Factors the ALJ considered in deciding Kitt was not medically impaired included that Kitt had "not received any pain relief stronger than Ibuprofen" and that she had not "undergone . . . physical therapy[.]" *Id.* at 27.

The ALJ determined that Kitt had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR § 404.1567(a). *Id.* In making the RFC assessment, the ALJ relied on the "the objective medical evidence and other evidence" and "opinion evidence." *Id.* Significantly, the ALJ noted that the "[t]reating source documentation has been very sparse in this case." *Id.* at 26. He accorded Dr. Joshi's medical opinion "highly significant weight" but completely discounted the portion of Joshi's assessment that would support Kitt's disability claim (specifically, that she required a cane to walk). *Id.* at 27. The ALJ also accorded Diaz's opinion "highly significant weight," while acknowledging that as a nurse practitioner he "cannot render diagnoses for establishing medically determinable impairments." *Id.* at 27, at n.2. Here too, he chose to discount the part of Diaz's assessment that was consistent with physical limitations, specifically, that Kitt could not lift or carry more than five pounds. *Id.* at 27.

At step four, the ALJ found that Kitt was able to perform her past relevant work as an administrative assistant and therefore was not disabled. *Id.* at 27-28.

## DISCUSSION

A.    *The Legal Standards*

1.    *Section 405(g)*

Under 42 U.S.C. § 405(g), Kitt has the right to have a district court review "any final decision of the Commissioner of Social Security made after a hearing to which [s]he was a party, irrespective of the amount in controversy," and the court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The court can also choose to "remand the case to the Commissioner of Social

Security[,]" or, in appropriate cases, to "order additional evidence to be taken before the Commissioner of Social Security."  42 U.S.C. § 405(g).

In reviewing the Commissioner's decision, I must decide if it is supported by substantial evidence and if the correct legal standards were applied.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  To decide this, I examine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quotation marks and citation omitted).  I then decide if the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Perales*, 402 U.S. at 401).  As discussed above, the Act requires that a hearing for disability benefits be a nonadversarial proceeding, and the ALJ "has an affirmative obligation to develop the administrative record."  *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted).

2.    *Duty to Develop the Record*

As mentioned above, a hearing for disability benefits is a non-adversarial process, and the ALJ has a duty to develop the administrative record.  The duty to develop the record exists even when a claimant is represented by a paralegal, as Kitt was here.  *Perez*, 77 F.3d at 47.

3.    *The Treating Physician Rule*

Under the treating physician rule, the opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(c) & 416.927(c); *see, e.g.*, *Halloran*, 362 F.3d at 31–32; *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).   Because of this rule, the ALJ's duty is "particularly important when it comes to obtaining information from a claimant's treating physician."  *Devora v.*

11

*Barnhart*, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y. 2002). This obligation includes obtaining the treating physicians' assessments of the claimant's residual functional capacity ("RFC"). *Lawler v. Astrue*, No. 10-CV-3397, 2011 WL 5825781, at *7 (E.D.N.Y. Nov.14, 2011) ("An ALJ's affirmative obligation to develop the record also includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity."); *Hardhardt v. Astrue*, 05-CV-2229 (DRH), 2008 WL 2244995, at *9 (E.D.N.Y. May 29, 2008) ("[T]he ALJ was obligated to ensure that the record was fully developed, which would include obtaining the treating physicians' assessments of [the claimant]'s functioning."). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsford v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities.")).

4.    *Weighing Credibility*

An ALJ must assess a claimant's credibility regarding his or her pain when there is conflicting evidence in the record regarding the extent of the pain. *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). The weight assigned to the claimant's testimony regarding the pain is within the ALJ's discretion. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). However, "the ALJ's discretion is not unbounded." *Calzada v. Asture*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). First, "the subjective element of [the plaintiff's] pain is an important factor to be considered in determining disability." *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). Second, the ALJ "must assess subjective [testimony] in light of objective medical facts and

diagnoses." *Williams ex rel. Williams*, 859 F.2d 255, 261 (2d Cir. 1988). However, "subjective

pain may serve as the basis for establishing disability, even if unaccompanied by positive clinical

findings or other objective medical evidence." *Donato v. Sec. of Dep't of Health and Human*

*Servs. of U.S.*, 721 F 2d 414, 419 (2d Cir. 1983) (internal quotations, alterations and citation

omitted). If the claimant's testimony as to pain is not fully supported by clinical evidence,

the ALJ must consider additional factors in assessing that testimony: (1) the claimant's daily

activities; (2) the location, duration, frequency and intensity of symptoms; (3) the precipitating

and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medications

taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any

other factors concerning the individual's functional limitations due to pain or other

symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) & 416.929(c)(3)(i)(vi).

B.      *The Defects in the Commissioner's Decision*

        1.      *The Adversarial Tone of the Proceedings*

                As discussed above, a hearing on a claim for disability benefits is not supposed to

be adversarial. It should be conducted in a manner that is consistent with the beneficent purpose

of the program. The mission of an ALJ is to conduct a fact-finding exploration in a fair and

neutral manner, unencumbered by any predisposition about the claim. *See Echevarria*, 685 F.2d

at 755. The ALJ here, however, conducted a proceeding that reeked of hostility.

                Many of the questions during the hearing had the clipped pace of a cross-

examination, and in fact that prevented the ALJ from developing the record. For example, Kitt

was clearly confused when the ALJ, who was reading from a single page of the medical records

(that page can be found at R. at 266), told Kitt that she had denied having "syncope." R. at 41-

42. That question would have confused me too. Here's how that examination began:

| | |
|---|---|
| ALJ: | Denies syncope. |
| Kitt: | I'm sorry, what? |
| ALJ: | Denies syncope. |
| Kitt: | What is that? |
| ALJ: | In other words dizziness, no dizziness? |
| Kitt: | I was having all of those things. |
| ALJ: | You were? |
| Kitt: | Yes. |
| ALJ: | Well how come they said you didn't? |

*Id.* at 41. One wonders how Kitt was supposed to know why an unspecified person said in an unspecified record that she denied dizziness. But the ALJ didn't seem to care anyway, as the rest of the questioning revealed:

| | |
|---|---|
| Kitt: | I don't understand why either. Is that the first – because the first doctor – |
| ALJ: | Wait, wait, wait. |
| Kitt: | Okay. |
| ALJ: | [still reading] Pulmonary, patient denies cough, wheezing, pleurisy . . . , sputum, and excessive snoring. Did you deny all those things? |

*Id.* Once Kitt confirmed that she had indeed suffered from "syncope," the ALJ should have developed the record by asking her, for example, when she had suffered from it, its severity, and its effect on her functioning. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) & 416.929(c)(3)(i)(vi). Throughout the hearing, however, the ALJ conducted a superficial inquiry into Kitt's condition and left the record undeveloped with incomplete responses.

The repeated concessions by the Commissioner's counsel at oral argument that that conduct of the ALJ in this case was indefensible (*see* Transcript of the proceedings on April

13, 2015 ("Tr."), at 12-14) eliminate the need to catalog all the examples, but the ALJ's reaction to Kitt's testimony about using the subways is illustrative. Kitt moved from Pennsylvania to New York, where her children live, and once she got public assistance she moved in with one of her daughters in the Bronx. When asked how often she used a subway, she said once a month for a medical appointment. The ALJ questioned as follows:

| | |
|---|---|
| ALJ: | Where is the doctor located? |
| Kitt: | Down at NYU 123rd [sic] Street? |
| ALJ: | So you travel from the Bronx down to 23rd Street? |
| Kitt: | Yes. |
| ALJ: | What made you choose a doctor down there as opposed to where you live? |
| Kitt: | Because I was looking around trying to find a doctor to go to and I didn't really know of any doctors. |
| ALJ: | What were the criteria that you were using?? |
| Kitt: | Well I was trying to find somebody that was good that would work with my diabetes, you, take care of my diabetes because I knew I had to see a doctor. |

R. at 51-52. These seemed like the normal responses of a claimant with an undisputed serious illness who moved cities and needed to find medical care. But the ALJ smelled doctor-shopping:

| | |
|---|---|
| ALJ: | Were you looking for someone that would take your position with respect to whether or not you were disabled? |
| Kitt: | I'm sorry? |
| ALJ: | Were you looking for someone who would take your same position with respect to whether or not you were disabled? |
| Kitt: | No, I went because of the diabetes. I was looking for someone to treat me for the diabetes. |

*Id.* at 52.

Again, those seemed like sensible answers, but the ALJ moved in for the kill:

15

ALJ:    Well you already had somebody to treat you for the diabetes.

*Id.*

But he neglected a key fact:

Kitt:    That was in PA but now I was in New York so I needed someone in New York.

*Id.*

The other problem with this misguided and skeptical line of inquiry is that the doctor the ALJ accused Kitt of "shopping" for did not conclude that she was disabled.

In short, these and numerous other inquiries at the hearing were not the questions of a fair and neutral factfinder.

2.    *The ALJ's Credibility Assessment of Kitt*

The ALJ's cynicism toward Kitt also impaired his ability to make a proper credibility determination.  It prevented him from asking questions that would have afforded Kitt the opportunity to clarify issues of apparent importance to the ALJ himself.  For example, the fact that Kitt did not take any pain medication more severe than Ibuprofen was a significant concern for the ALJ; he expressly identified that fact as one of the reasons he did not believe Kitt.  *See id.* at 26-27.  But he failed to ask Kitt about it.  He might have asked, for example, whether she had sought other pain medications or whether doctors had recommended other pain medications.  There may have been good reasons – ones that do not undermine Kitt's veracity – for the fact that she had not taken stronger medication.  Perhaps there was the possibility of adverse interactions with Kitt's diabetes medication.  Even if stronger medications were available, prescribed, and not in conflict with Kitt's other medications, there might have been a reason she did not take them that is consistent with her being a truth-teller about her subjective complaints.  Some people cannot afford medications.

3. *The ALJ Failed to Develop the Record*

The ALJ also failed to develop the record as to Kitt's treating physicians' opinions. Specifically, the record does not include a single RFC assessment from any of Kitt's treating physicians,[4] including Dr. Davidson, Dr. Hossain or Dr. Haden. The ALJ acknowledged that the treating source documentation was "very sparse," yet did not obtain additional documentation, reports or RFC assessments from any of the physicians who had treated Kitt during the relevant time period. *Id.* at 26. Davidson had found her temporarily disabled in May 2012. *Id.* at 251. Haden had seen Kitt months before the hearing and had recommended that she see a bone specialist and a physical therapist. *Id.* at 213. Hossain examined Kitt several times in 2012 and had also found her temporarily disabled. *Id.* at 266-87. RFC assessments from the treating physicians would have provided a superior foundation for the ALJ to make his RFC determination and credibility assessment.

The only disability assessment in the record is from nurse practitioner Diaz, who the ALJ acknowledged could not render a medical diagnosis. *Id.* at n.2. Despite this acknowledgement, the ALJ proceeded to accord Diaz's opinion (that Kitt could sit continuously for one hour at a time and for a total of five hours in a day, or stand continuously for one hour and for a total of two hours in a day, and walk continuously for 10 minutes at a time and a total of five hours in a day) "highly significant weight." *See id.* at 27. However, this assessment does not support the ALJ's finding that Kitt could perform sedentary work because "[a]ccording to the SSA, sedentary work generally involves up to *two hours of standing or walking* and *six hours of sitting* in an eight-hour work day." *Beckles v. Barnhart*, 340 F. Supp. 2d 285, 289 (E.D.N.Y. 2004) (citing *Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir. 2000)) (emphasis in original). Furthermore, the ALJ discounted Diaz's assessment that Kitt could never lift more than five

---

[4] The record does include one RFC assessment from a nurse practitioner, as discussed below.

pounds, and could only lift one to five pounds occasionally, which is also inconsistent with sedentary work. *Id.* The ALJ stated that he was discounting this portion of Diaz's opinion based on lack of corroboration, though none of her other treating physicians addressed Kitt's weight-carrying capabilities or any other functional capacities. *Id.* at 27. Had the ALJ properly developed the record and obtained the treating physicians' opinions, this assessment by Diaz may have been corroborated.

The ALJ also discredited portions of the consultative examiner's assessment that supported Kitt's claims, and credited those that did not. Specifically, the ALJ discounted Dr. Joshi's conclusion that Kitt needed a cane to ambulate, despite several references in the record regarding her use of a cane, and no record evidence contradicting it. *Id.* at 35, 314, 319. Yet the ALJ credited the portion of Joshi's opinion that was consistent with the conclusion that Kitt could perform sedentary work and accorded it "highly significant weight." *Id.* at 27. As the consulting physician, Joshi's opinion deserved limited weight because consultative exams are often brief, are generally performed without reviewing the claimant's medical history, and offer only a glimpse of the claimant on a single day. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In addition, there were inconsistencies in Joshi's assessment. Specifically, he stated that Kitt could sit for five hours, stand two hours, and walk two hours at one time, but also that she could sit six hours, stand one hour, and walk one hour total in an eight-hour work day. R. at 319. It is unclear how Kitt could stand and walk for two hours at a time but then could only stand and walk for one hour in a work day. The discrepancy required further inquiry and clarification, and calls the ALJ's near-exclusive reliance on Joshi's assessment further into question. *Id.* at 319.

The ALJ noted Kitt's (alleged) failure to undergo physical therapy as a factor in determining that her condition was not severe and that she could perform sedentary work. *Id.* at

27. But the record shows that Kitt in fact had gone to physical therapy sessions – the ALJ simply failed to make any further inquiry about the treatment. *See id.* at 50-51. An "ALJ must address all pertinent evidence and his failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Sofronis v. Astrue*, No. 09-CV-3713 (ENV), 2011 WL 3701837, at *9 (E.D.N.Y. Aug. 23, 2011). This includes evidence in the record he failed to acknowledge (such as Kitt's use of a cane, that she took insulin, and that she attended physical therapy) and evidence he failed to develop.

      4.     *Kitt's Newly Submitted Evidence*

      Kitt provided multiple new treatment opinions with her reply brief. The new records include opinions from neurologist Dr. Deepika Bajaj dated November 7, 2014, physician's assistant Dina Louie dated August 6, 2014, and physical therapist Dr. Islam Bekhet dated November 7, 2014.[5] These opinions are not merely cumulative, as they describe Kitt's symptoms as more severe than previously reported. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) ("[A]n appellant must show that the proffered evidence is . . . 'new' and not merely cumulative of what is already in the record[.]" (quotations and citation omitted)). They are material because they are relevant to her condition during the time period for which benefits

---

[5]      The new evidence includes: (1) an eye examination report from June 7, 2014 that indicated her vision had declined further to 20/250 and 20/125 uncorrected. Plaintiff's Motion ("Pl. Mot.") at 25; (2) A note from Dr. Anna Gabrielian from March 13, 2014, stating the patient has diabetic retinopathy and needed follow up treatment. *Id.* at 49; (3) Nerve conduction velocity studies from April 22, 2014 finding her results consistent with polyneuropathy. *Id.* at 16; (4) A note from Dr. Steven Agemy on October 9, 2014 holding Kitt had severe nonproliferative diabetic retinopathy in both eyes with macular edema. *Id.* at 50; (5) Records from Cure Touch Rehab and Physical Therapy from October 28, 2014 and November 7, 2014 stating Kitt had been treated for lumbar spine radiculopathy and muscle spasms since October 28, 2014 and that she was advised to rest and not sit, stand, climb stairs, or walk for long periods of time. *Id.* at 12-15, 26-27; (6) An MRI of Kitt's lumbar spine from November 3, 2014 showing many bulging discs, lateral disc herniation, and grade 1 spondylolisthesis. *Id.* at 9-10. (7) A letter from Dr. Deepika Bajaj from November 7, 2014, stating Kitt had a disc bulge in the lumbar spine that may affect her daily mobility, and that she was totally disabled and could not work. *Id.* at 7; (8) A letter from Dina Louie, a physician's assistant, form December 11, 2014 stating Kitt had a history of right hip fracture, osteoarthritis, and chronic low back pain with sciatica and that she needed bed rest when in pain. *Id.* at 11; (9). A second letter from Dina Louie dated December 11, 2014 stating Kitt had osteoarthritis with chronic low back pain and sciatica and uncontrolled diabetes with diabetic neuropathy and that she needed bed rest during the day periodically. *Id.* at 48.

were denied as they show a worsening of her condition. *See id.* And as a *pro se* litigant, she had good cause for not having submitted them earlier because she may not have understood "the importance of obtaining specific evidence" of her condition.[6] *See id.* I need not decide whether the new evidence, by itself, would warrant a remand. Because a remand is necessary for the reasons set forth above, the Commissioner may consider all relevant evidence, including the newly submitted records, when revisiting Kitt's claim.

C.      *The Remedy*

The ALJ conducted Kitt's hearing in a manner inconsistent with the spirit and the statutory requirements of the Act. I therefore remand the case for a fair hearing. Under 20 C.F.R. § 404.940, "remand to a new ALJ is necessary in those situations which compromise" the integrity of the disability review process. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (internal citations omitted). "Specifically, when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate." *Id.* Factors I may consider in making this determination include: (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; or (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party. *Id.* Applying these factors to this case, I conclude that the case should be assigned to a different ALJ on remand.

---

[6]      The Commissioner contends that Kitt was not *pro se* because she was represented by Legal Aid at the ALJ hearing. Def. Reply Br. at 5. However, Kitt was not represented by a lawyer; it was a paralegal who was at the hearing, which doesn't negate Kitt's *pro se* status. *See, e.g.*, *Perez*, 77 F.3d at 47 (having a paralegal at a hearing did not mean the ALJ did not have a duty to develop record).

Accordingly, the case is remanded for further proceedings consistent with this opinion.

So ordered.

John Gleeson, U.S.D.J.

Dated: July 13, 2015
      Brooklyn, New York